604 So.2d 1023 (1992)
Alfred NICHOLES, et al.
v.
ST. HELENA PARISH POLICE JURY.
Alfred NICHOLES, et al.
v.
MOTORS INSURANCE CORPORATION, et al.
Wanda SMITH, et al.
v.
ST. HELENA PARISH POLICE JURY.
Nos. 91 CA 0342 to 91 CA 0344.
Court of Appeal of Louisiana, First Circuit.
June 29, 1992.
Writ Denied October 29, 1992.
*1025 Ron S. Macaluso, Hammond, for the Police Jury.
Charles A. Schuette, Jr., Baton Rouge, for Motors Ins. et al.
Glenda Barkate, Jay C. Zainey, Metairie, for Medical Center of Louisiana at New Orleans.
Paul H. Due, Baton Rouge, Robert J. Carter, Greensburg, for Alfred Nicholes, et al.
Richard A. Schwartz, Amite, for Wanda Smith, et al.
Before LOTTINGER, SHORTESS, LANIER, CRAIN and FOIL, JJ.
LANIER, Judge.
These consolidated actions are suits for damages in tort arising out of a head-on collision between two automobiles on a parish road.
Alfred Nicholes, individually and on behalf of his three minor children and his wife, Barbara Curry Nicholes (the Nicholes), filed two separate suits. One suit was filed against William Fisher, who was alleged to be vicariously liable for the negligent acts of his daughter, Angela Fisher, a minor at the time of the accident; Angela Fisher; and the insurer of the Fisher vehicle, Motors Insurance Corporation (MIC). A second suit was filed against the St. Helena Parish Police Jury (Parish) as custodian of the Anderson Road, which was alleged to be unreasonably dangerous and a cause of the accident. The Charity Hospital of New Orleans, through the Department of Health and Human Resources (Charity), intervened in both suits, seeking recovery of the expenses of treating Mr. Nicholes. The suits were consolidated and tried by stipulation in the Parish of Tangipahoa.[1]
The trial court ruled in favor of the Nicholes. It awarded Mr. Nicholes $1,005,269.50 for general damages, loss of earning capacity and past medical expenses. It awarded $50,000.00 to Mrs. Nicholes and $15,000.00 to each of the three Nicholes children for loss of consortium. Fault was apportioned between the Fishers and the Parish at 50% each. The trial court found Angela Fisher at fault because she was at least 3-½ feet into Mr. Nicholes' lane of travel. The Parish was found at fault because it failed to stripe the center line of the road, it failed to paint "no passing" lines on the roadway, and it failed to properly maintain the shoulder and roadway. The trial court found MIC solidarily liable up to its policy limits of $50,000 and cast it for interest on the total award. Finally, the trial court granted the Nicholes an attorney fee of 40% of the amount recovered by Charity. The Parish, Charity, and MIC have appealed.

FACTS
Anderson Road (St. Helena Parish Road Number 31) is like many rural roads in our state. It is a hard-surfaced, two-lane highway. Apparently, when the road was hard-surfaced in 1971, it had two nine-foot lanes and a three-foot shoulder on either side, for a total width of 24 feet. The road was never striped. It does not have a painted center line or a painted edge stripe. The east side of the northbound lane (Nicholes' lane) was partially obscured by 16 inches to 18 inches of mud, pine straw, and grass.
*1026 On January 1, 1988, at approximately 1:45 p.m., Angela Fisher was driving her father's 1982 Buick Skylark in a southerly direction on Anderson Road. At this same time and place, Alfred Nicholes was driving his 1972 Chevrolet pickup truck in a northerly direction. At the top of a relatively steep hill, the Fisher vehicle and the Nicholes vehicle were involved in a head-on collision.
There are several undisputed facts. First, Nicholes was within his "true" and "apparent" lane of travel, and he was not at fault in the accident. Second, Angela Fisher was very familiar with Anderson Road. Third, the posted speed limit was 40 miles per hour. Finally, the Nicholes vehicle was 76 inches wide, and the Fisher vehicle was 69 inches in width.
Angela Fisher could remember virtually nothing about the accident.[2] Ashley Fisher, Angela's younger sister who was a guest passenger in the vehicle at the time of the accident, testified she saw the Nicholes vehicle right before the vehicles collided. She also stated that she called out her sister's name, and Angela turned and looked at her. She did not know if Angela was still looking at her at the time of impact.
Alfred Nicholes testified he was traveling approximately 35 miles per hour at the time of the accident. The Fisher vehicle was approximately one car length in front of him when he first saw it, and the vehicles impacted so quickly he was not sure how far he managed to move his truck to the right.

LIABILITY OF THE PARISH
After acknowledging the Parish was not required under the Louisiana Manual on Uniform Traffic Control Devices, 1971 Edition, to center stripe Anderson Road, the trial court, in finding the road defective, relied heavily on the testimony of James Clary, who was accepted as Nicholes' expert in highway engineering and highway safety. The trial court held the failure of the Parish to stripe Anderson Road imposed a more onerous burden on the Parish to inspect and maintain its roadways. The court also found the failure of the Parish to paint any striping, along with its failure to properly maintain the roadway, caused motorists to gravitate toward the center of the road.
Professor A.J. McPhate, who was accepted by the court as an expert in accident reconstruction, testified on behalf of Nicholes. McPhate accepted the testimony of Mr. Nicholes that he was driving approximately 35 miles per hour. McPhate testified that based on his calculations the Fisher vehicle was traveling approximately 10 miles per hour faster than the Nicholes vehicle. Therefore, after accounting for potential error, he testified Angela Fisher was traveling at a speed of no less than 40 miles per hour and no more than 50 miles per hour.[3] He also testified that there was a 16-inch to 18-inch collision overlap between the two vehicles; that Angela Fisher was approximately 3-½ feet across the apparent center of the highway (in fact, she was more in Nicholes' lane than her own); that the west side of the Nicholes vehicle was approximately one foot from the actual center line of the highway; that if the roadway was clear of sod, and if Nicholes had been in the same spot on the highway (which was within his own lane), the extra width would not have mattered because Nicholes did not have enough time between spotting the Fisher vehicle coming over the hill and impact to move over more; and that even if Nicholes was over an additional 1.4 feet (or 16.8 inches) the accident would still have occurred because of the 18-inch collision overlap of the vehicles.
*1027 The owner, or person having custody, of immovable property has a duty to keep such property in a reasonably safe condition. He must discover any unreasonably dangerous condition on his premises and either correct the condition or warn potential victims of its existence. This duty is the same under the strict liability theory of La.C.C. art. 2317 as under the negligent liability theory of La.C.C. art. 2315. Usually the difference in proof between these theories of liability is that under La.C.C. art. 2315, it must be shown that the owner, or person in custody, either knew or should have known of the risk, whereas under La.C.C. art. 2317, a claimant is relieved of proving the defendant's knowledge of the risk. Clement v. State, Department of Transportation and Development, 528 So.2d 176 (La.App. 1st Cir.), writ denied, 532 So.2d 157 (La. 1988). However, La.R.S. 9:2800(B) provides that even under a strict liability theory, when the defendant is a public entity, the plaintiff must prove that the defendant had actual or constructive knowledge of the vice or defect and failed to remedy it within a reasonable time. This statute and rule of law is applicable to parishes, as well as to the State of Louisiana. Watts v. Tangipahoa Parish Council, 576 So.2d 1063 (La. App. 1st Cir.), writ denied, 581 So.2d 690 (La.1991). Under either theory of liability (when the defendant is a public entity), the plaintiff has the burden of proving that: (1) the property which caused the damage was in the "custody" of the defendant; (2) the property was defective because it had a condition that created an unreasonable risk of harm to persons on the premises (breach of the duty); (3) the defendant had actual or constructive knowledge of the risk; and (4) that the defect in the property was a cause in fact of the resulting injury. In both negligence and strict liability cases, the reasonableness of the risk is determined by balancing the probability and magnitude of the risk against the utility of the thing. Under either theory of liability, the court must decide if the risk which causes the injury is within the ambit of protection of the duty.
A parish has the same duty as the State to maintain public highways in a reasonably safe condition and remedy conditions that make the roadways unsafe. Michel v. Ascension Parish Police Jury, 524 So.2d 1369 (La.App. 1st Cir.), writ denied, 530 So.2d 567 (La.1988). The duty to remedy arises from knowledge of an unsafe condition on the highway. Before a parish may be held liable for an accident caused by a hazardous or dangerous condition on a roadway, it must be shown that it had actual or constructive notice of the condition and a sufficient opportunity to remedy the situation or at least warn motorists of its presence, and failed to do so. Naylor v. Louisiana Department of Public Highways, 423 So.2d 674 (La.App. 1st Cir.1982), writs denied, 429 So.2d 127, 134 (La.1983). A temporary condition existing in the travelled portion of a roadway does not constitute a defect in the roadway as contemplated by La.C.C. art. 2317. A "defect" is some flaw or fault existing or inherent in the thing itself. The temporary existence of other objects which may constitute a hazard on the roadway does not constitute a defect in the roadway. Kyle v. City of Bogalusa, 506 So.2d 719 (La.App. 1st Cir. 1987). Cf. Collins v. Christophe, 479 So.2d 537 (La.App. 1st Cir.1985), writ denied, 483 So.2d 1021 (La.1986). Whether a breach of this duty has occurred depends on the particular facts and circumstances of each case. Manasco v. Poplus, 530 So.2d 548 (La.1988).
The determination of whether a negligent act or omission is a cause in fact of the harm is a factual question. A trial court's finding of fact may not be set aside in the absence of "manifest error." Rosell v. ESCO, 549 So.2d 840 (La.1989).
The trial court held that if "the road width had been 18' through proper maintenance or by proper striping", the accident would not have occurred.[4] Nicholes contends *1028 the trial court did not err in reaching this conclusion. Specifically, Nicholes contends that if the roadway had been properly maintained, it would have been approximately 18 inches wider; that he would have been driving 18 inches closer to the shoulder; that Fisher would not have felt the need to occupy the center of the road; and that if the overlap between the vehicles was 16 inches (the low end of McPhate's estimate, 16 to 18 inches),[5] the accident would not have occurred except for the improperly maintained road.
A litigant cannot prevail on speculation alone. See Manasco v. Poplus, 530 So.2d at 550 (where the Louisiana Supreme Court rejected the argument that if the highway had a shoulder that was in conformity with modern standards, the driver of a double-axle dump truck would have been able to steer around a stopped vehicle). The record does not support the trial court's factual finding that the Parish's alleged omissions were a cause in fact of the accident. Even though the overwhelming bulk of the sod and grass was on the east side of the northbound lane, Nicholes was not influenced by the grass and sod. He was traveling within his actual and apparent lane. If the road had been striped and a full 18 inches wider, Nicholes' lane would have increased only 9 inches in width and not the full 18 inches. Moreover, if the road had been 18 inches wider, Angela Fisher would still have been approximately 2 feet 9 inches into Nicholes' lane of travel.
Angela Fisher was very familiar with Anderson Road. She was also a relatively inexperienced driver who was traveling faster than the weather conditions warranted. There was ample space for two vehicles to pass. Even if we accept the fact that the lack of an additional 18 inches in the roadway caused drivers to gravitate toward the center, it does not explain why Angela Fisher was approximately 3-½ feet into Nicholes' apparent lane of travel. Based on the record before us, we conclude the trial court was clearly wrong in finding as a fact that the fault of the Parish was a cause of the accident. See Johnson v. American Southern Insurance Co., 569 So.2d 1071 (La.App. 3d Cir.1990) (a head-on collision where the court held a narrow road and the existence of some overhanging limbs and brush were not a substantial factor in causing the accident); Holt v. Rapides Parish Police Jury, 574 So.2d 525 (La.App. 3d Cir.1991) (a head-on collision where the court held tall roadside foliage was not a substantial factor in the accident when both drivers were familiar with the road, there was ample room to pass, and both drivers were driving down the center of the road).
This assignment of error has merit.

INTEREST OWED BY MIC
MIC contends it should not be held liable for post-petition interest on the entire amount of the judgment when its policy limits in this case are only $50,000.00. We agree. The MIC policy contains a supplementary payments clause which provides in pertinent part: "In addition to our limit of liability, we will pay on behalf of a covered person: ... 3. Interest accruing after a judgment is entered in any suit we defend." This court recently interpreted identical language contained in an uninsured motorist policy to mean the insurer is liable for post-petition interest (from date of judicial demand) on the policy limits until the judgment is signed, and only after the judgment is signed does the insurer become liable for interest on the entire *1029 amount. Malbrough v. Wallace, 594 So.2d 428 (La.App. 1st Cir.1991), writ denied, 596 So.2d 196 (La.1992); Remedies v. Lopez, 560 So.2d 118 (La.App. 3d Cir.), writ denied, 563 So.2d 1155 (La.1990).
The trial court issued written reasons for judgment on January 8, 1990. Subsequently, a dispute arose concerning the amount of interest owed by MIC. The Nicholes filed a motion to cast MIC in solido for legal interest on the entire amount of the judgment from the date of judicial demand. MIC opposed the motion. The trial court ruled against MIC and signed a judgment in favor of the Nicholes on August 16, 1990. On June 26, 1990, MIC filed a motion to deposit funds into the registry of the court. The duty judge granted the motion and allowed MIC to deposit its policy limits, along with interest on the policy limits, into the registry of the court. In brief, Nicholes contends he was not aware of the tender and did not learn of its existence until after reviewing the record on appeal.
In Purvis v. American Motors Corp., 538 So.2d 1015, 1020-1021 (La.App. 1st Cir.1988), writ denied, 541 So.2d 900 (La.1989), this court held that for a tender to be valid the money must be placed into the power of the adverse party. If paid into the court registry, it must be with the intention on the part of the debtor that the creditor shall be at liberty to take it out of the registry. Here, the motion to deposit funds into the registry of the court does not contain a certificate of service on the adverse party. Moreover, the motion does not indicate there was a tender to, and a refusal to accept, by Nicholes, which would indicate Nicholes was aware MIC was attempting to tender the amount it owed. Obviously, Nicholes became aware of the deposit at some point in the proceedings. However, based on the record before us, we cannot determine the exact date this occurred.
Accordingly, we remand the case for an evidentiary hearing for the sole purpose of determining when Nicholes first became aware of the MIC tender. If Nicholes knew of the tender from the beginning, MIC owes no additional interest. If Nicholes became aware of the tender before the judgment was signed, MIC owes additional interest on the amount of its policy limits from the date of tender until the date Nicholes knew of it. If Nicholes became aware of the tender after judgment, however, MIC owes additional interest on its policy limits from the date of tender until judgment, together with interest on the entire amount of the judgment (less credit for the amount of principal tendered) from date of judgment until the date Nicholes knew of the tender.
This assignment of error has some merit.

ENTITLEMENT OF ALFRED NICHOLES TO AN ATTORNEY FEE FROM CHARITY
Charity intervened in both suits seeking reimbursement of $27,265.61 for medical services rendered to Mr. Nicholes. Mr. Nicholes reconvened against Charity for a reasonable attorney fee for the services of his attorneys for prosecuting the main demands, citing Moody v. Arabie, 498 So.2d 1081 (La.1986) as authority. The trial court rendered judgment in favor of Charity on its intervention and rendered judgment in favor of Mr. Nicholes for 40% of the Charity award as an attorney fee for the trial of the main demands and an additional 5% in the event of an appeal. Charity appealed this adverse judgment.
In Moody v. Arabie, 498 So.2d at 1085-1086 appears the following:

The workers' compensation law is silent on the subject of who is obliged to pay the costs of litigation or recovery against the third person. Formerly, the statute expressly provided for the employer to be reimbursed his costs and a reasonable attorneys' fees, thereby, in effect, imposing the total burden of recovery costs upon the worker. Act 247 of 1920. In 1958, however, the statute was amended to eliminate this provision and to leave the statute devoid of any statement on the subject. Act 109 of 1958. Because the workers' compensation statute does not expressly provide for the allocation of litigation costs, or *1030 costs of recovery, the statute must be construed with reference to other laws on the same subject matter. La.C.C. art. 17.

When an employer pays compensation to a worker who has been injured by the wrongful act of a third person, the employer and the worker become co-owners of a property right consisting of a right to recover damages from the third person. Since the Civil Code has not dealt in detail with co-ownership of single things, the task to construct a doctrine has fallen to the writers, using as help the statutory principles furnished by the titles on ownership, successions, and partnership contract....
The interests of co-owners do not represent distinct material units. Therefore none of them can exercise without the consent of the other co-owners any physical or legal acts aimed at the whole or even the smallest specific portion of the thing, if such acts imply the present and direct exercise of ownership. Id. at 331. No co-owner may cause any material changes, unless all the co-owners have consented, tacitly if necessary. Acts by a sole co-owner, if useful to all, are ratified as a defacto agency (negotiorum gestio). Id. Each co-owner may force the others to contribute to the costs of maintenance and conservation of the common thing in proportion to their interests; but they can acquit themselves of this duty by abandoning their co-ownership right....

Applying this doctrine to the action and right against the third person, we conclude that, with respect to any cost necessary to the maintenance and conservation of the right, each co-owner is always obliged to contribute in proportion to his interest in the right, and that, with respect to any other litigation costs, each co-owner is responsible for his proportionate part of reasonable and necessary expenses and legal services that accrue to his benefit. Under the doctrine, each co-owner is liable for necessary maintenance and conservation costs, such as those involved in filing suit and interrupting prescription, regardless of whether he consented to them. Ordinarily he would not be bound for other litigation costs incurred without his consent, but the workers' compensation law dispenses with the requirement of his consent. The statute authorizes either the worker or the employer to affect and materially change the whole right by prosecuting a suit against the third person and by recovering for all damages sustained. Moreover, whenever the worker or the employer intervenes in such an action, he tacitly consents to a material change in the right and ratifies all reasonable and necessary acts which are useful and beneficial to his interest.
Under these principles the necessary and reasonable costs of recovery are to be apportioned between the worker and the employer according to their interests in the recovery.
(Emphasis added; citations and a footnote omitted)
The essence of the Moody v. Arabie rationale is that (1) the workers' compensation law is silent about payment of litigation costs by the employer and the worker against a third party tortfeasor, (2) the employer and worker are co-owners of the tort cause of action against a third party tortfeasor, and accordingly, the general law pertaining to co-ownership (ownership in indivision)[6] controls their legal relations on the issue of payment of litigation costs, (3) the employer and worker (as co-owners) cannot exercise any legal acts involving the direct ownership of the cause of action without the consent of the other, (4) either the employer or worker (as a co-owner) can force the other to contribute to the cost of *1031 litigating (preserving) the tort cause of action, and (5) the necessary and reasonable costs of recovery on the tort cause of action should be apportioned between the employer and the worker according to their interest in the recovery.[7]
Contrary to the silence of the workers' compensation laws (prior to Acts 1989, No. 454), the statutes pertaining to the recovery of expenses by state supported (Charity) hospitals from third party tortfeasors are quite vocal. La.R.S. 46:8 provides, in pertinent part, as follows:
Where a patient in any state supported... hospital in the state has been injured by the negligence of another person other than his employer, ... and has a right of action for the recovery of compensatory damages against that person, the department... shall be subrogated to the right of action to the extent of reasonable charges for services rendered to the patient, in accordance with like charges in other first class hospitals, including physicians' and surgeons' fees.
(Emphasis added)
A subrogation is the substitution of one person (Charity) to the rights of another (Mr. Nicholes). La.C.C. art. 1825. A subrogation may be total or partial. La.C.C.P. art. 697. Where the subrogation is partial, and the thing involved is a cause of action, co-ownership results. Moody v. Arabie; Cf. Comment (e) for La.C.C. art. 1829. Compare Southern Farm Bureau Casualty Insurance Company v. Sonnier, 406 So.2d 178 (La.1981); McLain v. Caddo Parish School Board, 599 So.2d 878 (La.App. 2nd Cir.1992). Because Charity's subrogation herein takes place by operation of law (La.R.S. 46:8), it is a legal subrogation. La.C.C. arts. 1825 and 1829.
This subrogation of a charity hospital has been statutorily invested with a substantial number of procedural protections that are greater than those of a tort victim-patient. Peart v. Rykoski, Inc., 195 La. 931, 197 So. 605 (1940). La.R.S. 46:9 provides as follows:
§ 9. Copy of petition to be served on hospital when patients sue for injuries
A. Any person who has received in any of the charity hospitals of the state or in a veterans administration hospital in the state treatment for injuries which might entitle him to damages or compensation, and who files suit for the recovery of the damages or compensation, shall cause a copy of the petition to be served on the hospital from which he received treatment, or on the attorney designated to represent the hospital, at least ten days before the trial of the suit.
B. No court of this state shall proceed with the trial of any suit involving any claim referred to in this Section, unless a copy of the petition has been served as required, or such service has been waived as provided in Subsection C.
C. Nothing in this Section shall prevent the plaintiff or his attorney and the attorney representing the charity hospital or veterans administration hospital from entering into a written agreement stipulating that in the event of a favorable judgment for the plaintiff, the bills for services due the hospital shall be paid before all other disbursements of the award. Such an agreement may be accompanied by a waiver of the service of the petition upon the hospital otherwise required in Subsection A.
(Emphasis added)
La.R.S. 46:10 provides as follows:
§ 10. Compromise of claim not to affect rights of the hospital
No compromise of any claim referred to in R.S. 46:9, whether made before or after the filing of suit, shall affect the right of any of the charity hospitals of this state or of any veterans administration hospital in the state to recover the fees and charges, if any, that may be due the hospital for treatment, from any party *1032 or parties who may be liable for them under any law of this state.
La.R.S. 46:11 provides as follows:
§ 11. Proceedings for recovery of charges due hospitals
All proceedings for the recovery of any charges or fees due any charity hospital of this state or any veterans administration hospital in the state may be presented in any court of this state, in term time or in vacation, by rule, in a direct action or by intervention, or by third opposition, and all the proceedings shall be tried or heard summarily and by preference in all courts, after notice of not less than two days to adverse parties.
(Emphasis added)
La.R.S. 46:11.1 provides as follows:
§ 11.1 Intervention in personal injury and worker's compensation suits
A. The Department of Health and Hospitals, on behalf of any of the general charity hospitals under the administration of said department, or the United States, on behalf of any veterans administration hospital in the state, or any military treatment facility, may intervene at any time prior to judgment in any personal injury suit or in any suit involving worker's compensation claims in which any of these hospitals has an interest, for the purpose of recovering the cost of drugs, X-rays, laboratory fees, surgical, medical, and other expenses of hospitalization and services rendered.
B. It is the intention of this Section that prescription shall not run against the intervention by the department or a veterans administration hospital, or any military treatment facility, in the state in any such suit in which any of them may have an interest until judgment has been rendered in the cause in the court of original jurisdiction or the prescriptive period provided by law for the cause of action has run, whichever is the later.
La.R.S. 46:12 provides as follows:
§ 12. Prima facie truth of pleadings of hospitals
Whenever the pleadings filed on behalf of any charity hospital of this state or any veterans administration hospital in the state are accompanied by an affidavit of the director or any officer of the hospital or of the attorney designated to represent the hospital, that the facts as alleged are true to the best of the affiant's knowledge or belief, all of the facts alleged in the pleadings shall be accepted as prima facie true and as constituting a prima facie case, and the burden of proof to establish anything to the contrary shall rest wholly on the opposing party.
The purpose of these procedural protections is to insure that charity hospitals are paid for the medical services they render; these statutes are not for the benefit of the patient or the tortfeasor. Times v. Wickman, 261 So.2d 113 (La.App. 4th Cir.1972). These procedural protections show that although a charity hospital is subrogated to the rights of the tort victim-patient, it does not need the consent of the tort victim-patient to enforce its subrogation rights in the courts.[8]
Further, the selection and compensation of attorneys representing charity hospitals for this type of subrogation claim are specifically provided for in La.R.S. 46:15, which provides as follows:
§ 15. Counsel for hospitals
The attorney general shall designate counsel to represent state hospitals in all claims and cases arising under this Chapter, and whenever so designated and a claim is placed in his hands the counsel shall be paid by the hospital a fee of twenty-five percent of the first five hundred dollars collected, twenty percent of the next five hundred dollars collected and fifteen percent of the excess of one thousand dollars collected, said fee to be *1033 paid out of any funds accruing to the hospital by reason of the claim or case.
In addition, pursuant to La.R.S. 9:4751-4755 charity hospitals (and other enumerated health care providers) have a privilege for payment of their claims for expenses for the treatment of tort victim-patients. Under general law, the property of a debtor (third party tortfeasor) is the common pledge of his creditors, and the proceeds of its sale must be distributed among them ratably, unless there exists among the creditors some lawful causes of preference. La.C.C. art. 3183. Lawful causes of preference are privilege and mortgages. La.C.C. art. 3184. A privilege is a right, which the nature of a debt gives to a creditor, and which entitles him to be preferred before other creditors, even those who have mortgages. La.C.C. art. 3186.
La.R.S. 9:4752 provides as follows:
§ 4752. Privilege on net proceeds collected from third party in favor of medical providers for services and supplies furnished injured persons
A health care provider, hospital, or ambulance service that furnishes services or supplies to any injured person shall have a privilege for the reasonable charges or fees of such health care provider, hospital, or ambulance service on the net amount payable to the injured person, his heirs, or legal representatives, out of the total amount of any recovery or sum had, collected, or to be collected, whether by judgment or by settlement or compromise, from another person on account of such injuries, and on the net amount payable by any insurance company under any contract providing for indemnity or compensation to the injured person. The privilege of an attorney shall have precedence over the privilege created under this Section. (Emphasis added)

The record shows that Charity properly perfected its privilege pursuant to La.R.S. 9:4753. A health care provider's claim under this privilege is not subject to reduction because of the comparative fault of a tort victim-patient; the subrogation claim of an employer (or workers' compensation insurer) for the comparative fault of a tort victim-worker is reduced by the percentage of fault of the tort victim-worker. Compare Dearing v. Schwab, 525 So.2d 211 (La.App. 1st Cir.), writ denied, 530 So.2d 90 (La. 1988) with La.R.S. 23:1101(B).
Finally, pursuant to the last sentence of § 9:4752, the privilege of a health care provider is primed by the privilege of an attorney. La.R.S. 9:5001 provides as follows:
§ 5001. Privilege for fees
A. A special privilege is hereby granted to attorneys at law for the amount of their professional fees on all judgments obtained by them, and on the property recovered thereby, either as plaintiff or defendant, to take rank as a first privilege thereon.
B. The term "professional fees", as used in this Section, means the agreed upon fee, whether fixed or contingent, and any and all other amounts advanced by the attorney to or on behalf of the client, as permitted by the Rules of Professional Conduct of the Louisiana State Bar Association.
The health care provider privilege attaches to "the net amount payable to the injured person ... out of the total amount of any recovery ... collected ... by judgment..." (Emphasis added). La.R.S. 9:4752 and 9:5001 must be construed in reference to each other. La.C.C. art. 13. When this is done, first preference must be given to the fee claim of the attorney for the tort victim-patient, and second preference must be given to the health care provider for "the reasonable charges or fees of such health care provider". As indicated in Dearing v. Schwab, this statutory scheme contemplates full recovery of the health care provider's claim. Further, since the health care provider has a privilege on the judgment ("net amount payable to the injured person ... collected ... by judgment), and since the judgment is a property right owned by the tort victim-patient, the tort victim-patient is the debtor of the health care provider for purposes of the privilege.
*1034 Accordingly, after considering all of the pertinent statutory law, we conclude that Moody v. Arabie is not applicable because the legal relations of the parties are controlled by specific statutes that provide otherwise; the general law on co-ownership is not controlling. The trial court was legally wrong in its ruling. Moore v. State of Louisiana for the Louisiana State University Medical Center at Shreveport, 596 So.2d 293 (La.App. 3rd Cir.1992); Charity Hospital of Louisiana in New Orleans v. Band, 593 So.2d 1392 (La.App. 4th Cir. 1992).
This assignment of error has merit.

DECREE
For the foregoing reasons, (1) the judgment in suit number 12,310 in favor of the Nicholes and against the Parish is reversed, and judgment is rendered in favor of the Parish and against the Nicholes dismissing the claims of the Nicholes with prejudice, and the Nicholes are cast for all costs of this suit; (2) the judgments in suits number 12,310 and 12,334 in favor of the Nicholes on their reconventional demands for attorney fees and litigation expenses against Charity are reversed, and judgment is rendered in favor of Charity and against the Nicholes dismissing both reconventional demands with prejudice; (3) the judgment in suit number 12,334 awarding legal interest in favor of the Nicholes against MIC is reversed, and the issue of the entitlement of the Nicholes to legal interest from MIC is remanded to the trial court for an evidentiary hearing and a reassessment of legal interest against MIC in an amended judgment in accordance with the views expressed herein; and (4) in all other respects, the judgment in suit number 12,334 is affirmed. MIC, Angela Fisher and William Fisher are cast for the cost of the appeal in suit number 12,334.
REVERSED AND RENDERED IN PART; REVERSED AND REMANDED IN PART; AFFIRMED IN PART.
CRAIN, J., concurs.
SHORTESS, J., concurs in part and dissents in part with reasons.
SHORTESS, Judge, concurring in part and dissenting in part.
I agree with the opinion set forth by the majority, except for its treatment of the issue related to the apportionment of attorney fees.
Under LSA-R.S. 46:8 a charity hospital is legally subrogated to the rights of the patient to the extent of reasonable charges for services rendered to the patient. See also comment (e) following La.C.C. art. 1829 ("Besides the situations provided for in this Article, legal subrogation takes place in other instances, such as subrogation of a state supported charity hospital to the rights of a patient.") Citing Moody, the majority correctly points out that "[w]hen subrogation is partial, and the thing involved is a cause of action, co-ownership results."
After apparently finding that Charity and the tort victim/patient are co-owners, the majority cites various statutes to show Moody is inapplicable because the legal relations of the parties are controlled by specific statutes, which are, at least by inference, alleged to be substantially different than those articles found in the Worker's Compensation Act. The majority's attempt to distinguish the two statutory schemes is not persuasive.
The majority points out that LSA-R.S. 46:10 provides that "no compromise of any claim ... shall affect the right of any of the charity hospitals of this state ... to recover the fees and charges ... that may be due the hospital...." However, LSA-R.S. 23:1103(A)(2) similarly provides that "[n]o compromise with such third person by either the employer or the injured employee or his dependent shall be binding upon or affect the rights of others unless assented to by him." See also LSA-R.S. 23:1102(C)(2).
The majority points out that LSA-R.S. 46:11 allows the charity hospitals of this state to proceed in a "direct action" against the tort-feasor. However, LSA-R.S. 23:1101(B) also allows "[a]ny person having paid or having become obligated to pay compensation under the provisions of this *1035 Chapter may bring suit against such third person to recover any amount which he has paid or becomes obligated to pay as compensation to such employee or his dependents."
The majority points out that under LSA-R.S. 46:11.1(A) a charity hospital, through the Department of Health and Hospitals, may "intervene at any time prior to judgment in any personal injury suit or in any suit involving worker's compensation claims in which any of these hospitals has an interest...." However, LSA-R.S. 23:1102(A) also provides:
If either the employee or his dependent or the employer or insurer brings suit against a third person as provided in R.S. 23:1101, he shall forthwith notify the other in writing of such fact and of the name of the court in which the suit is filed, and such other may intervene as party plaintiff in the suit.
The majority points out that under LSA-R.S. 9:4752(A) a charity hospital of the state has a privilege
on the net amount payable to the injured person, his heirs, or legal representatives, out of the total amount of any recovery or sum had, collected, or to be collected, whether by judgment or by settlement or compromise, from another person on account of such injuries, and on the net amount payable by any insurance company under any contract providing for indemnity or compensation to the injured person. The privilege of an attorney shall have precedence over the privilege created under this Section.[1]
However, LSA-R.S. 23:1103 provides in pertinent part:
A(1) In the event that the employer or the employee or his dependent becomes party plaintiff in a suit against a third person, as provided in R.S. 23:1102, and damages are recovered, such damages shall be so apportioned in the judgment that the claim of the employer for the compensation actually paid shall take precedence over that of the injured employee or his dependent; and if the damages are not sufficient or are sufficient only to reimburse the employer for the compensation which he has actually paid, such damages shall be assessed solely in his favor; but if the damages are more than sufficient to so reimburse the employer, the excess shall be assessed in favor of the injured employee or his dependent, and upon payment thereof to the employee or his dependent, the liability of the employer for compensation shall cease for such part of the compensation due, computed at six percent per annum, and shall be satisfied by such payment. The employer's credit against its future compensation obligation shall be reduced by the amount of attorney fees and court costs paid by the employee in the third party suit.
The majority points out that under the last sentence of LSA-R.S. 9:4752 the patient's attorney has a privilege on the net proceeds collected from the third party tort-feasor and that this privilege primes that of the hospital. However, a similar privilege is granted to attorneys under LSA-R.S. 23:1141, which provides:
Claims of attorneys for legal services arising under this Chapter shall not be enforceable unless reviewed and approved by a hearing officer. If so approved, such claims shall have a privilege upon the compensation payable or awarded, but shall be paid therefrom only in the manner fixed by the hearing officer.
See also LSA-R.S. 9:5001.
Other than appearing in court for the purpose of stipulating to the amount of the intervention, there is no evidence that intervenor took any risk, financial or otherwise, or performed any acts to assist in the prosecution of plaintiffs' case. Nicholes bore the entire risk and did all of the work necessary to successfully complete the case. As a result of plaintiffs' efforts, intervenor recovered its claims and should share in the expenses of litigation.
*1036 In sum, I would conclude the relationship between the charity hospital system and Nicholes is more akin to co-owner than debtor-creditor.
Accordingly, I respectfully dissent from this aspect of the majority opinion.
NOTES
[1] Wanda Smith, individually and as tutrix of Jennifer and Jason Richmond, guest passengers in the Fisher vehicle, also brought suit against the Fishers and the Parish. However, the suit was settled after the appeal was taken and does not form part of this appeal.
[2] However, she did testify that she did not need a center stripe to know how to stay in her own lane. On cross-examination the following exchange occurred:

Q Ms. Fisher, you're not suggesting to the Court that for you to drive in the right lane, there has to be a center stripe down the road?
A No sir.
[3] The testimony of John Reigel, the accident reconstructionist who testified on behalf of the Parish, was basically in accord with McPhate concerning the speed of the Fisher vehicle.
[4] Specifically, the trial court stated that:

Defendant Police Jury argues that the facts support the contention that the accident would have happened even if the road surface has been striped and properly cleared. This contention is overshadowed by the weight of credible evidence. The testimony of defendant's own expert (Mr. John Regal) was clear that, had Nicholes been travelling 1.4' to the right, the accident would have occurred, but been much less severe. I am convinced that it is more likely than not that the accident would not have occurred at all had the road width been 18' through proper maintenance or by proper striping. In all events, it meets the "substantial factor" test of Trahan v. State, DOTD, 536 So.2d 1269, at 1272, 1273. (La. App. 3d Cir.1988), writ denied, 541 So.2d 854 (La.1989).
[5] Reigel testified there was a maximum of 16 inches of overlap between the vehicles. However, unlike McPhate, Reigel believed the Fisher vehicle was traveling at an angle toward the Nicholes vehicle instead of traveling in a parallel line.
[6] Ownership is the right of a person to direct, immediate, and exclusive authority over a thing and the right to use, enjoy and dispose of the thing within the limits and under the conditions established by law. La.C.C. art. 477. Co-ownership exists when two or more persons own the same thing in indivision, each having an undivided share. La.C.C. art. 480. At the time of the operative facts of this case (January 1, 1988), the legal relations between co-owners was controlled generally by the jurisprudence. This jurisprudence was essentially codified by Acts 1990, No. 990, effective January 1, 1991. La.C.C. arts. 797-818.
[7] Moody v. Arabie has been legislatively overruled in part by Acts 1989, No. 454 which amended La.R.S. 23:1103 effective January 1, 1990. W. Grimley, Sharing the Load: Proportioning Litigation Cost Under Moody, 38 La.B.J. 159 (1990); H. Johnson, Developments in the Law 1988-1989: Workers' Compensation, 50 La. L.Rev. 391, 398-400 (1989).
[8] A charity hospital is only subrogated to the cause of action of the tort victim-patient "the extent of the reasonable charges for services rendered to the patient". Thus, if the charity hospital exercises its right to a direct action for recovery of these charges, it can only obtain judgment in that amount. This result would be the same under general subrogation law. La. C.C. art. 1830; Murray v. Sapp, 573 So.2d 495 (La.App. 1st Cir.1990).
[1] Admittedly, the amount of the hospital's recovery is not reduced in proportion to the victim's/patient's fault as under the Worker's Compensation Act. However, this difference is not relevant to the question presented in this case, i.e., whether the charity hospital system should share in the cost of litigation, including attorney's fees.